**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 MAY 10  PM 2: 16

CLERK

BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| Yisroel Teitlebaum | ) | |
| 252 Depot Road | ) | |
| Milford, CT 06460 | ) | Case No. |
| | ) | |
| Plaintiff, | ) | 2:23-CV-88 |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Officer Ryan P. O'Neil | ) | |
| 2 E. Main Street | ) | |
| Wilmington, VT 05363 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| Jennifer Nilsen | ) | |
| 37 Look Road | ) | |
| Wilmington, VT 05363 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| Eric Potter | ) | |
| 21 Look Road | ) | |
| Wilmington, VT 05363 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| David Boliver | ) | |
| 11 Myhre Hill Road | ) | |
| Wilmington, VT 05363 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| Town of Wilmington Selectboard | ) | |
| 2 East Main St. | ) | |
| Wilmington, VT 05363 | ) | |
| Defendants. | ) | |

1

## COMPLAINT

Plaintiff Yisroel Teitlebaum, through his attorneys and for his Complaint against
Defendants Officer Ryan P. O'Neil, Jennifer Nilsen, Eric Potter, David Boliver, and Town of
Wilmington Selectboard pleads as follows.

## PARTIES

1. Plaintiff, Yisroel Teitlebaum, is an individual domiciled in the State of Connecticut.

2. Defendant Officer Ryan P. O'Neil is an individual domiciled, on information and belief,
in the State of Vermont.

3. Defendant Jennifer Nilsen is an individual domiciled in the State of Vermont.

4. Defendant Eric Potter is an individual domiciled in the State of Vermont.

5. Defendant David Boliver is an individual domiciled in the State of Vermont.

6. Defendant Town of Wilmington Selectboard is the local legislative body of the
municipality of Town of Wilmington, Vermont.

## JURISDICTION AND VENUE

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, which provides
district courts with jurisdiction over civil actions arising under the United States Constitution or
laws of the United States, with pendent jurisdiction over state law claims pursuant to 28 U.S.C.
§ 1367; and also pursuant to 28 U.S.C. § 1332, as there is diversity between the parties and the
amount in controversy exceeds $75,000, exclusive of the interest and costs of this action.

8. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391, as the events giving
rise to Plaintiff's claims occurred in this District.

2

## FACTUAL ALLEGATIONS

### *The Nordic Hills Lodge in Wilmington, Vermont*

9.   There is a lodging property located at 34 Look Road in Wilmington, Vermont

("Property").

10. The Property, shown in the photograph below, was built in the 1960s by one Alf Nilsen

to serve as an inn.



11. Alf Nilsen was Defendant Jennifer Nilsen's father-in-law.

12. Mr. Nilsen operated the Property as an inn from the time of its construction in the 1960s

until 1986.

13. In 1986, Mr. Nilsen sold the Property to the Molner family, who operated the Property as

an inn from 1986 until 2005.

14. In 2005, the Molner family sold the Property to Bruce & Katherine Korb, who operated

the Property as an inn from 2005 through 2011.

15. In 2011, Deborah & Terrance Perkins purchased the Property and operated the Property as an inn from 2011 through 2014.

16. In 2014, Hermitage Inn Real Estate Holding Company, LLC ("Hermitage") purchased the Property.

17. The Hermitage used the Property to provide housing for large groups of Hermitage employees before the Property reverted back to Deborah & Terrance Perkins in October, 2019 following the Hermitage bankruptcy, tax sale, and conveyance by Deed of Collector of Delinquent Taxes of Scott Tucker.

18. After reassuming control of the Property in 2019, Deborah & Terrance Perkins "refurbished, refitted, and lovingly restored their inn."

19. Once Deborah & Terrance Perkins had renovated the Property to a point where the Property was "almost ready for occupancy," the Perkins decided to sell the Property.

20. When the Perkins listed the Property for sale, they noted the multiple potential uses for the Property, including continuing to use the Property for lodging large groups, as seen in the screenshot of the Perkins' real estate listing:

**with full state approval and service records available The building has many possible uses from Lodging, Ski Club, Care Home, Church Groups etc. Sitting on over 5 acres with outdoor pool, changing rooms**

21. As such, from the Property's construction in the 1960s through June 2021, the Property's various owners used the Property to lodge large groups of people.

22. Defendant Jennifer Nilsen, Defendant Eric Potter, and Defendant David Boliver all own properties abutting the Property.

23. Prior to June 2021, Defendant Nilsen, Defendant Potter, and Defendant Boliver did not complain about the Property housing large groups of people.

4

24. On June 9, 2021, Plaintiff, Yisroel Teitlebaum, purchased the Property.

25. Defendant Nilsen's, Defendant Potter's, and Defendant Boliver's conduct changed after Mr. Teitlebaum purchased the Property.

### *Yisroel Teitlebaum and His Family*

26. Mr. Teitlebaum lives in Connecticut with his family.

27. Mr. Teitlebaum is an observant Jew who follows the teachings of Chabad Chassidus.

28. Mr. Teitlebaum and his wife, Leah, have a large family with whom they enjoy spending time.

29. Mr. Teitlebaum and his wife have 5 children themselves, 20 siblings between them, and 50 nieces and nephews among those siblings.

30. The practice of Judaism is an important part of the time Mr. Teitlebaum spends with his family.

31. Mr. Teitlebaum, his family, and his friends have practiced Judaism at the Property since Mr. Teitlebaum purchased the Property in June 2021.

### *The Neighbors' Interference with Mr. Teitlebaum's Privacy and Use of His Property through the Wilmington Police Department and the Town of Wilmington*

32. During the time Mr. Teitlebaum has owned the Property, Mr. Teitlebaum's neighbors - Defendant Boliver, Defendant Nilsen, and Defendant Potter - have repeatedly interfered with Mr. Teitlebaum's privacy and Mr. Teitlebaum's use of the Property.

33. Defendant Boliver, Defendant Nilsen, and Defendant Potter have used the Wilmington Police Department, the Town of Wilmington, and the Administrative Officer for the Town of Wilmington to interfere with Mr. Teitlebaum's privacy and Mr. Teitlebaum's use of the Property.

34. In the less-than-two years that Mr. Teitlebaum has owned the Property, Defendant

5

Boliver, Defendant Nilsen, and Defendant Potter have collectively made more than fourteen complaints to the Wilmington Police Department, the Town of Wilmington, and the Administrative Officer (Zoning Administrator) for the Town of Wilmington regarding Mr. Teitlebaum's use of the Property.

35. Defendant Boliver, Defendant Nilsen, and Defendant Potter began complaining about Mr. Teitlebaum's use of his Property, including the practice of Judaism on the Property, almost immediately following Mr. Teitlebaum's purchase of the Property.

36. On June 20, 2021 - eleven days after Mr. Teitlebaum purchased the Property - Defendant Boliver and Defendant Potter filed a complaint with the Wilmington Police Department about Mr. Teitlebaum's use of the Property.

37. Specifically, Defendant Boliver and Defendant Potter complained about Mr. Teitlebaum performing a religious ritual that involved Mr. Teitlebaum bathing naked.

38. When Defendant Boliver complained about Mr. Teitlebaum performing this religious ritual, Defendant Boliver used the phrase "members of the Jewish community" to refer to Mr. Teitlebaum and his guests, as documented in the Wilmington Police Department's Call Summary

Report:



**Wilmington Police Department**
PO Box 217 2 East Main St
Wilmington VT 05363

**Call Summery Report**



| | |
|---|---|
| **Date :** | 06-20-21 |
| **Time:** | 0700-1700 |
| **Dispatcher:** | Luchsinger |
| | |
| **Case Number:** | 21WM00539 |
| **Responding Officer:** | M456 |
| **Call Type:** | Citizen Assist |
| **Time:** | 0835 |
| **Location:** | Look Road Bridge |
| **Summary:** | David Boliver reported that members of the Jewish community who purchase the Nordic Hills Lodge have been bathing naked under the Look Bridge. Most recent incident was at 0800 hrs today. |

39. Defendant Boliver's and Defendant Potter's complaint caused the Wilmington Police Department to respond to Mr. Teitlebaum's home.

40. Mr. Teitlebaum was neither charged with, nor convicted of, a crime as a result of Defendant Potter's and Defendant Boliver's June 20, 2021 complaint.

41. Two days later, on June 22, 2021, Defendant Potter complained to the Town of Wilmington's Town Manager regarding Mr. Teitlebaum's use of his Property.

42. When complaining to the Town Manager about Mr. Teitlebaum's use of his Property, Defendant Potter invoked Mr. Teitlebaum's religion.

43. As reflected in the Town Manager's notes, Defendant Potter referred to Mr. Teitlebaum as "[Hasidic] Jewish" in his complaint:



44. The very next day, June 23, 2021, Defendant Potter complained again to the Town of Wilmington's Town Manager again about Mr. Teitlebaum's use of his Property.

45. Defendant Potter again invoked Mr. Teitlebaum's religion, alleging a "[Hasidic] Jewish camp" was operating on Mr. Teitlebaum's Property, as documented in the Town Manager's notes:

46. On June 25, 2021, the Town of Wilmington sent a letter addressed to Mr. Teitlebaum regarding a "Zoning Compliance Concern" based on a statement by Mr. Teitlebaum's neighbors "that up to 60 youth campers" would be utilizing the Property over the summer.

47. The June 25th letter was sent to P.O. Box 9625 in Wilmington, Vermont, which is not Mr. Teitlebaum's Vermont address.

48. Mr. Teitlebaum never intended to have 60 youth campers at the Property during the summer of 2021, never informed his neighbors of an intent to have 60 youth campers at the Property during the summer of 2021, and never, in fact, had 60 youth campers utilizing the Property during the summer of 2021.

49. On July 1, 2021, Andrew Chevrefils, Public Health Inspection Manager, Vermont Department of Health, told Mr. Teitlebaum, "Thank you for providing the additional information about your establishment. As currently operated, your establishment does not fall under the scope of the Vermont Licensed Lodging Establishment Rule or the Licensed Children's Camp Rule. If your current operations remain as is, you will not need a license to operate a lodging establishment or children's camp from the Department of Health."

50. The June 25th letter was sent to P.O. Box 9625 in Wilmington, Vermont, which is not Mr. Teitlebaum's Vermont address.

51. On August 31, 2021, the Town Zoning Administrator tried to serve a Notice of Alleged Violation on Mr. Teitelbaum at P.O. Box 9625 in Wilmington, Vermont, which is not Mr. Teitlebaum's Vermont address.

52. Upon information and belief, there is no P.O. Box 9625 in Wilmington, Vermont.

53. The Town Zoning Administrator never sent the Notice of Alleged Violation to the correct address.

54. By failing to send the Notice of Alleged Violation to the correct address via certified mail, the Town Zoning Administrator failed to comply with 24 V.S.A. § 4451.

55. When the Town Zoning Administrator communicated with Mr. Teitlebaum's former attorney regarding zoning compliance concerns, Mr. Teitlebaum promptly complied with the Town directive to file an application with the Development Review Board.

56. On March 9, 2022, Defendant Potter complained to the Town of Wilmington's Zoning Administrator and Town Manager regarding Mr. Teitlebaum's use of his Property.

57. Defendant Potter's complaint caused the Town of Wilmington to contact Mr. Teitlebaum regarding the use of his Property.

9

58. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as a result of Defendant Potter's March 9, 2022 complaint.

59. On May 7, 2022, Defendant Nilsen complained to the Town of Wilmington's Zoning Administrator regarding Mr. Teitlebaum's use of his Property.

60. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as a result of Defendant Nilsen's May 7, 2022 complaint.

61. On May 13, 2022, Defendant Nilsen complained to the Town of Wilmington's Zoning Administrator regarding Mr. Teitlebaum's use of his Property.

62. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as a result of Defendant Nilsen's May 13, 2022 complaint.

63. On May 15, 2022, Defendant Boliver complained to the Town of Wilmington's Zoning Administrator regarding Mr. Teitlebaum's use of his Property.

64. In his May 15, 2022 email, Defendant Boliver referred to Mr. Teitlebaum and his guests - who are Jewish - as "those people":

**Subject: Nordic Hills**

**?**  **Dave Boliver** <dbugs14@yahoo.com>                                          Sun, May 15, 2022, 9:38 AM
to Mike Tuller

You are viewing an attached message. Monaghan Safar Ducham PLLC Mail can't verify the authenticity of attached messages.

Hi Mike - those people are at it again. They have a group of kids there & the noise has been non stop yesterday, last night & this morning. It looked like they were using the conference building last night too. Is anything going to be done about this? It seems like it's all words & no action. Thanks for listening. Dave Boliver.

65. Defendant Boliver's May 15, 2022 complaint suggested the Town of Wilmington should take some action against Mr. Teitlebaum.

66. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as

a result of Defendant Boliver's May 15, 2022 complaint.

67. On May 16, 2022, Defendant Nilsen complained to the Town of Wilmington's Town Manager regarding Mr. Teitlebaum's use of his Property.

68. Defendant Nilsen was upset about "the noise from 50+ people" staying at Mr. Teitlebaum's home, including "children . . . screaming and yelling the whole time while playing."

69. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as a result of Defendant Nilsen's May 16, 2022 complaint.

70. That same day, Defendant Potter complained to the Town of Wilmington's Zoning Administrator regarding Mr. Teitlebaum's use of his Property.

71. Defendant Potter informed the Town of Wilmington's Zoning Administrator that Defendant Potter felt the Town needed to "police the situation over at [Mr. Teitlebaum's Property] . . . ."

72. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as a result of Defendant Potter's May 16, 2022 complaint.

73. On May 26, 2022, Defendant Potter complained to the Wilmington Police Department about "a large gathering" at Mr. Teitlebaum's property that Mr. Potter believed to be generating too much noise.

74. Defendant Potter's complaint caused the Wilmington Police Department to respond to Mr. Teitlebaum's home.

75. Mr. Teitlebaum was neither charged with, nor convicted of, a crime as a result of Defendant Potter's May 26, 2022 complaint.

76. One day later, on May 27, 2022, Defendant Potter complained to the Town of

11

Wilmington's Zoning Administrator and Town Manager again regarding Mr. Teitlebaum's use of his Property.

77. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as a result of Defendant Potter's May 27, 2022 complaint.

78. On June 2, 2022, Defendant Nilsen made another complaint to the Town of Wilmington's Zoning Administrator and Town Manager regarding Mr. Teitlebaum's use of his Property.

79. Defendant Nilsen's June 2, 2022 complaint intimated the Town of Wilmington should take action against Mr. Teitlebaum.

80. The Town of Wilmington did not bring an enforcement action against Mr. Teitlebaum as a result of Defendant Nilsen's June 2, 2022 complaint.

81. On June 12, 2022, Defendant Boliver and Defendant Potter complained, again, to the Wilmington Police Department about Mr. Teitlebaum using his Property to perform a religious ritual.

82. Defendant Potter made note of Mr. Teitlebaum's religious beliefs, referring to the individuals at Mr. Teitlebaum's home as "the Hasidic Jews," as documented by the Wilmington Police Department:

-------------- M450: Luchsinger, Susan - 06/12/22 09:26 --------------
Eric Potter reported the Hasidic Jews are bathing naked in the river again. He is uncomfortable with it because he doesn't want his daughter to see.

83. Defendant Potter's and Defendant Boliver's complaint caused the Wilmington Police Department to make contact with Mr. Teitlebaum.

84. Mr. Teitlebaum was neither charged with, nor convicted of, a crime as a result of Defendant Boliver's and Defendant Potter's June 12, 2022 complaint.

85. On September 24, 2022, Defendant Potter complained to the Wilmington Police Department that Mr. Teitlebaum was "committing a light ordinance violation" at his Property.

86. Mr. Teitlebaum was neither charged with, nor convicted of, a crime as a result of Defendant Potter's September 24, 2022 complaint.

87. Ultimately, not one of Defendant Boliver's, Defendant Nilsen's, or Defendant Potter's complaints regarding Mr. Teitlebaum's use of his Property resulted in a substantiated criminal charge or a substantiated violation of the Town of Wilmington's Ordinances.

88. When making their complaints, Defendant Boliver and Defendant Potter referred to Mr. Teitlebaum and his family as "those people," "the Jewish community," and "the Hasidic Jews."

89. Defendant Boliver's, Defendant Nilsen's, and Defendant's Potter's complaints to the Wilmington Police Department and the Town of Wilmington regarding Mr. Teitlebaum's use of his Property were baseless harassment designed to interfere with Mr. Teitlebaum's privacy and Mr. Teitlebaum's use of his Property.

### *The Neighbors' Direct Interference with Mr. Teitlebaum's Privacy and Use of His Property*

90. In addition to using the Wilmington Police Department and the Town of Wilmington to interfere with Mr. Teitlebaum's privacy and his use of the Property, Defendant Boliver, Defendant Nilsen, and Defendant Potter have directly interfered with Mr. Teitlebaum's privacy and his use of his Property.

91. On multiple occasions, Defendant Nilsen and Defendant Potter have made video recordings of activities taking place on Mr. Teitlebaum's Property.

92. On multiple occasions, Defendant Nilsen and Defendant Potter have made audio recordings of activities taking place on Mr. Teitlebaum's Property.

93. On June 3, 2022, Mr. Teitlebaum met with Defendant Potter in an attempt to resolve any outstanding issues.

13

94. During their discussion on June 3, 2022, Defendant Potter demanded that Mr. Teitlebaum agree to a self-imposed ordinance of no noise whatsoever after 4:00 p.m.

95. During their discussion on June 3, 2022, Defendant Potter informed Mr. Teitlebaum that he doesn't respect someone new and different moving into the Town who does not change their ways to be like the locals.

96. Defendant Potter also told Defendant Nilsen he would "blast [music by the artist] [L]imp [Bizkit]" so there would be "a whole lot of f-bombs" from the music audible to the people on Mr. Teitlebaum's Property.

97. Defendant Boliver has displayed virulent anti-Semitism towards Mr. Teitlebaum.

98. On August 15, 2022, Defendant Boliver mounted a pig's head on a stake at a location where his property borders Mr. Teitlebaum's property, as shown in the photograph below:



99. Defendant Boliver mounted the pig's head on a stake at a location where it was visible to Mr. Teitlebaum and others on Mr. Teitlebaum's Property.

100.    Defendant Boliver mounting a pig's head on a stake at a location where it was visible to Mr. Teitlebaum and others on his property was an anti-Semitic gesture.

101.    Defendant Boliver mounting a pig's head on a stake at a location where it was visible to Mr. Teitlebaum and others on his property was a specific communication and/or threat regarding Mr. Teitlebaum's religious beliefs.

102.    Mr. Teitlebaum saw the pig's head mounted on a stake and, as someone who practices Judaism, understood the display to be an anti-Semitic threat directed at him and his family.

103.    On September 24, 2022, a group of Mr. Teitlebaum's family and friends was staying at the Property and two of the guests went on a walk; the female guest was wearing a tichel (a head covering that Jewish women wear to cover their hair for modesty) and the male guest was wearing a yarmulka.

104.    As the guests were walking down the Town of Wilmington public road, Defendant Jennifer Nilsen and one other woman were walking large dogs down the street, and the dogs were barking and getting very close to Mr. Teitlebaum's guests.

105.    Mr. Teitlebaum's guests requested that Defendant Nilsen and the other woman leash their dogs, and they responded: "Well maybe you shouldn't be on this road."

106.    On a separate occasion, Defendant Nilsen interacted with Mr. Teitlebaum's guests and told them to "go back where you came from."

### *Mr. Teitlebaum's Religious Practice on September 3, 2022 and Defendant Officer Ryan P. O'Neil's Response*

107.    On September 3, 2022, Mr. Teitlebaum hosted a group of roughly thirty family members and friends at his home in Wilmington.

108.    The group consisted of men, women, and children.

109.    Because Mr. Teitlebaum's Property has been operated as an inn since its construction in the 1960s, the Property allows Mr. Teitlebaum to comfortably host a group of this size.

110.    During the day, the children at Mr. Teitlebaum's home played outdoors and made the types of noise children make when playing outdoors.

111.    As September 3, 2022 was a Saturday, it marked the end of Shabbat, an important and meaningful weekly observance in Mr. Teitelbaum's religious practice.

112.    Shabbat ended around 8:00 pm on September 3, 2022.

16

113.     As Shabbat ended, Mr. Teitlebaum prayed the evening Maariv service indoors with a group of 10-12 of his male guests.

114.     The Maariv prayer service lasted fifteen to twenty minutes and involved spoken and sung prayer.

115.     After the Maariv service concluded, Mr. Teitlebaum went outside with the same group of men to conduct the Kiddush Levana service, another important component of Mr. Teitlebaum's religious practice.

116.     The Kiddush Levana service must be conducted outside, under the new moon.

117.     The Kiddush Levana service, which involved spoken and sung prayer, lasted five to ten minutes.

118.     After the conclusion of the Kiddush Levana service, Mr. Teitlebaum and his guests went inside to make Havdalah and formally conclude Shabbat.

119.     Around 8:30 pm - as Mr. Teitlebaum and his guests were praying the Kiddush Levana service on Mr. Teitlebaum's property - Defendant Potter and Defendant Boliver called the Wilmington Police Department to complain about noise coming from Mr. Teitlebaum's property.

120.     Defendant Officer Ryan P. O'Neil, a Patrol Officer with the Wilmington Police Department, was dispatched to Mr. Teitlebaum's Property in response to the complaints from Defendant Potter and Defendant Boliver.

121.     Defendant O'Neil had been to Mr. Teitlebaum's Property and had interacted with Mr. Teitlebaum prior to September 3, 2022.

122.     Another member of the Wilmington Police Department, Patrol Officer Joseph Carcich, responded to Mr. Teitlebaum's Property along with Defendant O'Neil.

17

123.    When they arrived at Mr. Teitlebaum's Property, Officer Carcich informed Mr. Teitlebaum and his family that the police were responding to a noise complaint.

124.    Mr. Teitlebaum's family explained to Officer Carcich that there had been "kids running around and prayers," but no other noise at the Property.

125.    Defendant O'Neil interjected that there had been "multiple complaints of the noise."

126.    Mr. Teitlebaum explained to Defendant O'Neil, in a direct and firm manner, that no violation of the State of Vermont's laws or the Town of Wilmington's Ordinances had occurred.

127.    According to Defendant O'Neil, Mr. Teitlebaum was "extremely rude and told [Defendant O'Neil and Officer Carcich they] were wrong and he would see [them] in court."

128.    Defendant O'Neil's and Officer Carcich's interaction with Mr. Teitlebaum and his family lasted roughly ninety seconds.

129.    Immediately after exiting Mr. Teitlebaum's home, Defendant O'Neil extended and flexed his arms in front of him, while clenching his fists, as depicted in the screenshot from Officer O'Neil's body worn camera below:



130.    Officer Carcich's body worn camera captured Defendant O'Neil flexing his arms and clenching his fists immediately after exiting Mr. Teitlebaum's home, as seen below:



131.    Defendant O'Neil then said, still only seconds after leaving Mr. Teitlebaum's home, "I just want to write a citation right now."

132.    Defendant O'Neil confirmed, however, that he had not witnessed Mr. Teitlebaum commit a crime, stating, "I didn't see it though."

133.    Despite not having witnessed any criminal offense and having no evidence that a criminal offense had occurred, Defendant O'Neil developed a scheme to issue a citation to Mr. Teitlebaum.

134.    As Defendant O'Neil and Officer Carcich walked away from Mr. Teitlebaum's home, Defendant O'Neil described his plan as such: "I'm gonna get a statement from [Mr. Teitlebaum's neighbors] and then I'm gonna mail [Mr. Teitlebaum] a citation."

135.    After hearing Defendant O'Neil's plan, Officer Carcich stopped walking, turned to face Defendant O'Neil, and said, "Really?"

136.    Defendant O'Neil responded, "Yeah."

137.    Officer Carcich asked, "'Cause you're that upset?"

138.    Defendant O'Neil responded, "Yeah."

### *Defendant O'Neil's Abuse of Process and Malicious Prosecution of Mr. Teitlebaum*

139.    As such, within seconds of exiting Mr. Teitlebaum's home on September 3, 2022, Defendant O'Neil had decided he was going to issue a citation to Mr. Teitlebaum for the crime of Noise in the Nighttime.

140.    At that point in time, Defendant O'Neil had no evidence Mr. Teitlebaum had made any "unnecessary and offensive" noise on September 3, 2022.

141.    At that point in time, Defendant O'Neil had no probable cause to believe Mr. Teitlebaum had committed the crime of Noise in the Nighttime, as Mr. Teitlebaum would have had to make "unnecessary and offensive" noise on September 3, 2022 to commit the crime of Noise in the Nighttime.

142.    On the contrary, the information available to Defendant O'Neil at that point in time confirmed there was no probable cause to believe Mr. Teitlebaum had committed the crime of Noise in the Nighttime.

143.    Defendant O'Neil's own Affidavit of Probable Cause demonstrates that on September 3, 2022, Defendant O'Neil had no information Mr. Teitlebaum had made "unnecessary and offensive" noise.

144.    Neither of the complaining witnesses with whom Defendant O'Neil spoke prior to interacting with Mr. Teitlebaum on September 3, 2022 - Defendant Potter and Defendant Boliver - identified Mr. Teitlebaum as the source of "unnecessary and offensive" noise.

145.    Ultimately, then, as he walked away from Mr. Teitlebaum's home on September 3, 2022, Defendant O'Neil decided to charge Mr. Teitlebaum with the crime of Noise in the Nighttime not because Defendant O'Neil had probable cause to believe Mr. Teitlebaum had committed that crime but, instead, because Defendant O'Neil was "so upset."

146.    As he drove away from Mr. Teitlebaum's home on September 3, 2022, Defendant O'Neil encountered Defendant Nilsen and her husband, who were walking their dog.

147.    Defendant O'Neil's Affidavit of Probable Cause implies Defendant O'Neil spoke with Defendant Nilsen and her husband prior to Defendant O'Neil's interaction with Mr. Teitlebaum.

148.    Defendant O'Neil's body worn camera, however, suggests his conversation with Defendant Nilsen occurred after Defendant O'Neil's interaction with Mr. Teitlebaum.

149.    Defendant O'Neil asked Defendant Nilsen and her husband if they could "write a written Statement" about the evening's events.

150.    Defendant Nilsen initially hesitated, responding "Ummm," but then decided "We could clearly hear them," and agreed to write a written statement.

151.    Defendant Nilsen asked Defendant O'Neil to give her copies of the written statement form so she could "drop it off for [Defendant Boliver] and [Defendant Potter]" to provide written statements as well.

152.    Defendant O'Neil responded, "Yeah, sure."

153.    Defendant Nilsen asked Defendant O'Neil if there would be an adverse consequence for Mr. Teitlebaum.

154.    Defendant O'Neil responded, "Yeah."

155.    Defendant Nilsen responded, "Oh, good."

21

156.     Defendant Nilsen then told Defendant O'Neil she had heard "kids screaming" at Mr. Teitlebaum's Property.

157.     As such, after his conversation with Defendant Nilsen, Defendant O'Neil still had no probable cause to believe Mr. Teitlebaum had committed the crime of Noise in the Nighttime.

158.     On September 6, 2022, Defendant Nilsen's husband, Karl Nilsen, provided a written statement about the events of September 3 to the Wilmington Police Department.

159.     On September 7, 2022, Defendant Boliver provided a written statement about the events of September 3 to the Wilmington Police Department.

160.     On September 17, 2022, Defendant Potter provided a written statement about the events of September 3 to the Wilmington Police Department.

161.     Defendant O'Neil relied on all three statements for the citation he issued and for his Affidavit of Probable Cause.

162.     None of the three statements upon which Defendant O'Neil relied identified Mr. Teitlebaum as the source of any noise on September 3, 2022.

163.     On the contrary, the written statements made clear the three complaining witnesses had no idea who made the noise(s) the complaining witnesses heard on September 3, 2022.

164.     As such, even after more than three weeks of investigation, having received three written statements from complaining witnesses, and having spoken with the complaining witnesses on the night of the alleged offense, Defendant O'Neil was still without evidence that Mr. Teitlebaum made any noise, let alone unnecessary and offensive noise, on September 3, 2022.

22

165. Defendant O'Neil did not have probable cause to believe that on September 3, 2022, Mr. Teitlebaum committed the offense of Noise in the Nighttime.

166. On the contrary, the evidence available to Defendant O'Neil reinforced there was no probable cause to believe Mr. Teitlebaum had committed the crime of Noise in the Nighttime.

167. Defendant O'Neil issued Mr. Teitlebaum a citation for the crime of Noise in the Nighttime on September 27, 2022.

168. Defendant O'Neil also provided an Affidavit of Probable Cause on September 29, 2022.

169. In his Affidavit of Probable Cause, Defendant O'Neil stated Mr. Teitlebaum would "need to appear at the Wilmington Police Department . . . for the taking of fingerprints and mug-shots."

170. Defendant O'Neil had no legal basis to demand Mr. Teitlebaum submit to fingerprinting and/or photographing for his alleged offense, which was a non-witnessed misdemeanor.

### *Dismissal of the Criminal Charge against Mr. Teitlebaum*

171. Mr. Teitlebaum was arraigned in the Windham Criminal Division on October 18, 2022.

172. During Mr. Teitlebaum's arraignment, the Windham Criminal Division confirmed Mr. Teitlebaum would be neither fingerprinted nor photographed.

173. On January 30, 2023, Mr. Teitlebaum filed a Motion to Dismiss the criminal charge against him.

174. The State filed its Opposition to Mr. Teitlebaum's Motion to Dismiss on February 14, 2023.

23

175.     On February 21, 2023, the Court granted Mr. Teitlebaum's Motion to Dismiss.

176.     In dismissing the Noise in the Nighttime charge against Mr. Teitlebaum, the

Windham Criminal Division found the facts alleged were "insufficient to demonstrate" Mr.

Teitlebaum had made any noise on September 3, 2022.

### *Town of Wilmington's Religious Discrimination and Adoption of New Noise Ordinance*

177.     In late 2021 or early 2022, Mr. Teitlebaum had a phone call with Zoning

Administrator Mike Tuller.

178.     During their phone call, Mr. Teitlebaum questioned why he was being treated

differently than others, and Mr. Tuller stated that following an incident in a nearby town where

Hasidic Jews rented spaces and did improper things, he wanted to be sure that Mr. Teitlebaum

didn't engage in similar improper conduct.

179.     At all times relevant to this action prior to April 18, 2023, the Town of

Wilmington's Noise Ordinance was set forth within Section 710 of Article VII of the

Wilmington Code. It stated that:

> continuous, permanent, ongoing or frequent noise in excess of that of a normal
> conversation (in the judgment of the Development Review Board) must not exist
> at the property line. Recurring periodic or intermittent noises in excess of that of a
> normal lawn mower (in the judgment of the Development Review Board) at the
> property line is allowed provided it does not occur between the hours of nine (9)
> PM and seven (7) AM, and does not significantly detract from or diminish other
> property's allowed Use or land development.

180.     The Selectboard was aware of the complaints made by Mr. Teitlebaum's

neighbors relating to religious gatherings at the Property, prayers at the Property, and religious

singing at the Property.

24

181.     In response to a written complaint about Mr. Teitlebaum's use of his property

from one of his neighbors, the Wilmington Zoning Administrator stated that the Town was

"aware of these concerns" and was "working to mitigate the situation in your neighborhood."

182.     On April 18, 2023, the Selectboard unanimously approved a new Noise

Ordinance pursuant to 20 V.S.A. § 3549, 24 V.S.A. §§ 2291(10), (1 and 15) and 24 V.S.A.

Chapter 59.

183.     The Noise Ordinance prohibits a person from "making[ing] or continu[ing] to

make any excessive, unnecessary, unreasonably loud noise or disturbance, or any prohibited

noise that disturbs, destroys, or endangers the comfort, quiet, repose, health, peace, or safety of

others within the immediate vicinity of the noise or disturbance."

184.     The Noise Ordinance outlines specific "Vocal Disturbances" which constitute a

violation of the ordinance.  Prohibited "Vocal Disturbances" include:

> any person who is participating in an activity or social event to actively make unreasonably
> loud noise. An activity or other social event is defined as a gathering upon the premises of
> one or more persons who is not a full-time resident of the premises. Unreasonably loud noise
> is noise that unreasonably interferes with the peace or health of members of the public or is
> plainly audible between the hours of 9:00 PM and 7:00 AM through the walls between units
> within the same building, from another property or from the street. It shall also be unlawful
> for any resident of any premises to allow an activity or social event occurring in or about the
> premises to produce unreasonably loud noise.

185.     The Noise Ordinance contemplates liability for any "owner or occupier of

premises, or any person who has been given lawful permission to use or control any premises,"

who "knowingly permit[s] a violation . . . by another person on such premises."

186.     The Noise Ordinance contemplates increased liability if there are multiple

complaints of a single alleged violation of the Ordinance, and states that each "time a police

officer is called to a scene of a noise complaint shall be deemed to be a separate offense."

25

## LEGAL ALLEGATIONS

### Count I – Religious Discrimination in Violation of the Equal Protection Clause
### (Against Defendant Town of Wilmington Selectboard)
### Liability under 42 U.S.C. § 1983

187.     Mr. Teitlebaum incorporates the paragraphs preceding Count I as if fully set forth herein.

188.     The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution prohibits municipalities from passing laws that have an adverse effect on a protected class of individuals and were motivated by discriminatory animus.

189.     The adoption of the new Noise Ordinance adversely effects Mr. Teitlebaum's ability to freely practice his religion on his Property.

190.     The Selectboard's adoption of the new Noise Ordinance incentivizes Mr. Teitlebaum's neighbors to call the police and make multiple noise complaints because each time a police officer is called to a property for a noise complaint shall be deemed a separate offense under the Noise Ordinance.

191.     The motivation of the Town Manager and Selectboard in drafting and passing a revised Noise Ordinance was to limit and/or eliminate Mr. Teitlebaum's practice of religious activities on the Property.

192.     The Selectboard, through its acts and omissions, engaged in conduct that deprived Mr. Teitlebaum of his rights under the Fourteenth Amendment to the United States Constitution.

### Count II – Violation of Free Exercise Clause of First Amendment
### (Against Defendant Town of Wilmington Selectboard)
### Liability under 42 U.S.C. § 1983

193.     Mr. Teitlebaum incorporates the paragraphs preceding Count II as if fully set forth herein.

194.     A law that regulates or prohibits conduct because it is undertaken for religious

reasons violates the Free Exercise Clause of the First Amendment unless it is justified by a

compelling interest and is narrowly tailored to advance that interest.

195.     A facially neutral law violates the Free Exercise Clause if it targets religious

conduct for distinctive treatment.

196.     The adoption of the new Noise Ordinance adversely effects Mr. Teitlebaum's

ability to freely practice his religion on his Property.

197.     The Selectboard's adoption of the new Noise Ordinance incentivizes Mr.

Teitlebaum's neighbors to call the police and make multiple noise complaints because each time

a police officer is called to a property for a noise complaint shall be deemed a separate offense

under the Noise Ordinance.

198.     The new Noise Ordinance is overly broad and is not narrowly tailored to advance

any compelling state interest.

199.     The motivation of the Selectboard in passing the new Noise Ordinance was to

limit and/or eliminate Mr. Teitlebaum's practice of religious activities on the Property.

200.     The Selectboard, through its actions and omissions, engaged in conduct that

violated Mr. Teitlebaum's rights under the Free Exercise Clause of the First Amendment.

## Count III – Violation of Religious Land Use and Institutionalized Persons Act (RLUIPA)
### (Against Defendant Town of Wilmington Selectboard)
### Liability under 42 U.S.C. § 2000cc-2

201.     Mr. Teitlebaum incorporates the paragraphs preceding Count III as if fully set

forth herein.

202.     A land use regulation that imposes a substantial burden on the religious exercise

of a person is prohibited under RLUIPA.

27

203.    The adoption of the new Noise Ordinance substantially burdens Mr. Teitlebaum's ability to freely practice his religion on his Property.

204.    The new Noise Ordinance is overly broad and is not narrowly tailored to advance any compelling state interest.

205.    The motivation of the Selectboard in passing the new Noise Ordinance was to limit and/or eliminate Mr. Teitlebaum's practice of religious activities on the Property.

206.    The Selectboard, through its actions and omissions, engaged in conduct that violated RLUIPA, causing harm to Mr. Teitlebaum.

### Count IV – Malicious Prosecution in Violation of the Fourth Amendment
### (Against Defendant O'Neil)
### Liability under 42 U.S.C. § 1983

207.    Mr. Teitlebaum incorporates the paragraphs preceding Count IV as if fully set forth herein.

208.    By issuing a citation to Mr. Teitlebaum to answer to the charge of Noise in the Nighttime when there was no probable cause to believe Mr. Teitlebaum had committed that crime, Defendant O'Neil instituted a proceeding against Mr. Teitlebaum without probable cause.

209.    Defendant O'Neil acted with malice when he instituted a proceeding against Mr. Teitlebaum without probable cause.

210.    By Defendant O'Neil's own admission, he instituted a proceeding against Mr. Teitlebaum because he was upset and/or angry with Mr. Teitlebaum, not because he had probable cause to believe Mr. Teitlebaum had committed the crime of Noise in the Nighttime.

211.    The criminal proceeding against Mr. Teitlebaum terminated in Mr. Teitlebaum's favor with the granting of Mr. Teitlebaum's Motion to Dismiss.

212.    Mr. Teitlebaum suffered damages as a result of Defendant O'Neil instituting a

proceeding against him without probable cause.

### Count V – Malicious Prosecution
### (Against Defendant O'Neil)
### Liability under Vermont State Law

213.    Mr. Teitlebaum incorporates the paragraphs preceding Count V as if fully set

forth herein.

214.    The factual allegations set forth with respect to Count IV (malicious prosecution

under 42 U.S.C. § 1983) establish that Defendant O'Neil instituted a proceeding against Mr.

Teitlebaum without probable cause with a malicious intent, the proceeding terminated in Mr.

Teitlebaum's favor, and Mr. Teitlebaum suffered damages as a result.

215.    Defendant O'Neil is liable for malicious prosecution under Vermont common

law.

### Count VI - Abuse of Process
### (Against Defendant O'Neil)
### Liability under Vermont State Law

216.    Mr. Teitlebaum incorporates the paragraphs preceding Count VI as if fully set

forth herein.

217.    Defendant O'Neil made improper, illegal, and/or unwarranted use of specific

court processes with respect to Mr. Teitlebaum.

218.    Defendant O'Neil's improper, illegal, and/or unwarranted use of court processes

against Mr. Teitlebaum included:

> a.  Issuing a citation to Mr. Teitlebaum to appear before the Windham Criminal
>     Division to answer for the crime of Noise in the Nighttime when there was no
>     probable cause to believe Mr. Teitlebaum had committed the crime of Noise in
>     the Nighttime;

29

b. Issuing a citation to Mr. Teitlebaum to appear before the Windham Criminal Division to answer for the crime of Noise in the Nighttime when there was no evidence supporting that Mr. Teitlebaum had made any noise, let alone the "unnecessary and offensive" noise required to violate the statute, on September 3, 2022; and

c. Issuing a citation to Mr. Teitlebaum, pursuant to V.R.Crim.P. 3(c), when there was no basis to do so;

d. Demanding Mr. Teitlebaum appear at the Wilmington Police Department for fingerprinting and photographing, pursuant to 20 V.S.A. § 2061(b), when there was no lawful basis to require Mr. Teitlebaum to submit to fingerprinting or photographing.

219.     Defendant O'Neil had an ulterior motive and/or purpose for these abuses of process, including Defendant O'Neil's admitted anger with Mr. Teitlebaum.

220.     Mr. Teitlebaum suffered damage as a result of Defendant O'Neil's abuse of process.

## Count VII - Intrusion Upon Seclusion
### (Against Defendant Nilsen, Defendant Potter, & Defendant Boliver)
### Liability under Vermont State Law

221.     Mr. Teitlebaum incorporates the paragraphs preceding Count VII as if fully set forth herein.

222.     Defendant Nilsen, Defendant Potter, and Defendant Boliver intentionally interfered with Mr. Teitlebaum's interest in solitude and seclusion on his Property.

223.     Defendant Nilsen, Defendant Potter, and Defendant Boliver intentionally interfered with Mr. Teitlebaum's private affairs and concerns.

30

224.     Defendant Nilsen's, Defendant Potter's, and Defendant Boliver's intentional interference with Mr. Teitlebaum's solitude, seclusion, and private affairs and concerns included, but was not limited to:

      a.  Filing repeated complaints with the Wilmington Police Department and Town of Wilmington - not one of which resulted in a substantiated criminal charge or ordinance violation - about Mr. Teitlebaum's lawful use of his Property, including Mr. Teitlebaum's practice of Judaism on his Property;

      b.  Making multiple video and audio recordings of lawful activities taking place on Mr. Teitlebaum's Property;

      c.  Speaking to Mr. Teitlebaum and/or his guests in a derisive manner; and

      d.  With respect to Defendant Boliver, mounting a pig's head on a stake at a location where the pig's head was visible to Mr. Teitlebaum and Mr. Teitlebaum's guests.

225.     Defendant Nilsen's, Defendant Potter's, and Defendant Boliver's intentional interference with Mr. Teitlebaum's solitude, seclusion, and private affairs and concerns was substantial and would be highly offensive to a reasonable person.

226.     Mr. Teitlebaum suffered damage as a result of Defendant Nilsen's, Defendant Potter's, and Defendant Boliver's conduct.

### Count VIII - Nuisance
### (Against Defendant Nilsen, Defendant Potter, & Defendant Boliver)
### Liability under Vermont State Law

227.     Mr. Teitlebaum incorporates the paragraphs preceding Count VIII as if fully set forth herein.

228.     Defendant Nilsen, Defendant Potter, and Defendant Boliver interfered with Mr. Teitlebaum's use of his Property.

31

229.    Defendant Nilsen's, Defendant Potter's, and Defendant Boliver's interference with Mr. Teitlebaum's use of his Property included, but was not limited to:

    a.  Filing repeated complaints with the Wilmington Police Department and Town of Wilmington - not one of which resulted in a substantiated criminal charge or ordinance violation - about Mr. Teitlebaum's lawful use of his Property, including Mr. Teitlebaum's practice of Judaism on his Property;

    b.  Making multiple video and audio recordings of lawful activities taking place on Mr. Teitlebaum's Property;

    c.  Speaking to Mr. Teitlebaum and/or his guests in a derisive manner; and

    d.  With respect to Defendant Boliver, mounting a pig's head on a stake at a location where the pig's head was visible to Mr. Teitlebaum and Mr. Teitlebaum's guests.

230.    Defendant Nilsen's, Defendant Potter's, and Defendant Boliver's interference with Mr. Teitlebaum's use of his Property was unreasonable and substantial.

### Count IX - Intentional Infliction of Emotional Distress
### (Against Defendant Boliver)
### Liability Under Vermont State Law

231.    Mr. Teitlebaum incorporates the paragraphs preceding Count IX as if fully set forth herein.

232.    When Defendant Boliver mounted a pig's head on a stake at a location where it was visible to Mr. Teitlebaum and others on Mr. Teitlebaum's Property, Defendant Boliver engaged in extreme and outrageous anti-Semitic conduct.

233.    When Defendant Boliver mounted a pig's head on a stake at a location where it was visible to Mr. Teitlebaum and others on Mr. Teitlebaum's Property, Mr. Boliver intended to express contempt and/or hatred for Mr. Teitlebaum based on Mr. Teitlebaum's religious beliefs.

234.     Defendant Boliver's extreme and outrageous anti-Semitic gesture was done with the intent to cause, or with reckless disregard of the probability of causing, emotional distress to Mr. Teitlebaum.

235.     Defendant Boliver's extreme and outrageous anti-Semitic gesture and imagery caused Mr. Teitlebaum emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

A. Attorney's fees and costs;

B. Injunctive relief;

C. Compensatory and punitive damages;

D. Interest; and

E. All other relief the Court deems just and equitable.

## JURY DEMAND

Plaintiff requests trial by jury on all issues so triable.


DATED at Burlington, Vermont this 10th day of May, 2023.

YISROEL TEITLEBAUM

By:     Pietro J. Lynn, Esq.
Lynn, Lynn, Blackman & Manitsky, P.C.
*Attorney for Plaintiff*
76 St. Paul Street, Suite 400
Burlington, VT 05401
802-860-1500
plynn@lynnlawvt.com